**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONNA J. ALTOONIAN,

      Petitioner,               Civil No. 5:08-CV-11189
                                  HONORABLE JOHN CORBETT O'MEARA
v.                           UNITED STATES DISTRICT JUDGE

MILLICENT WARREN,

      Respondent,
_____/

**OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL *IN FORMA PAUPERIS***

      Donna Altoonian, ("Petitioner"), confined at the Huron Valley Women's Complex in Ypsilanti, Michigan, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In her *pro se* application, petitioner challenges her convictions for two counts of first-degree murder, M.C.L.A. 750.316; and one count of felony-firearm, M.C.L.A. 750.227b. For the reasons stated below, the petition for writ of habeas corpus is DENIED.

## I. Background

      Petitioner was convicted of the above offenses following a jury trial in the Wayne County Circuit Court. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

I. Basic Facts And Procedural History

1

## A. Overview

Altoonian's convictions arise from the November 2001 shooting deaths of her two children.  Altoonian and her identical twin four-year-old sons lived with her father, Don Altoonian, in Dearborn, Michigan.  On November 14, 2001, Don Altoonian returned from an out-of-state business trip and expected Altoonian to meet him at the airport.  Because Altoonian was not at the airport and did not answer the telephone, Don Altoonian took a taxicab home, arriving at approximately 5:30 p.m.  Altoonian's vehicle was in the driveway, and the house was locked, but the mailbox was full.

Don Altoonian went inside and discovered Altoonian lying on the floor of the bedroom that she shared with her two children.  There was a bunk bed in the corner of the small bedroom.  Altoonian was lying on the floor, with her back against the bed.  Altoonian suffered from Meniere's disease, a congenital ear imbalance resulting in vertigo, so Don Altoonian assumed that she had an attack.  He asked Altoonian where the children were, and she said that she did not know.  He turned on the light and opened the curtains; at that point, he saw one of the children in the lower bunk of the bunk bed.  The child was cold and apparently dead.  Don Altoonian then called the police.  Don Altoonian did not realize that Altoonian was injured until emergency personnel told him that she had been shot.  There were no signs of forced entry or theft.

One of the twins was found on the left side of the bed, with a pillow over his face.  He was shot twice in the upper body, roughly front to back.  The other twin was found on the right side of the bed.  He was shot twice in the back, back to front, and once in the right arm.  The boys' wounds were inflicted from close range.  In addition, Altoonian had been shot in the neck.

In January 2002, Altoonian was found incompetent to stand trial.  She was hospitalized and received treatment.  In July 2003, Altoonian was declared competent to stand trial.  Altoonian was thereafter tried in October 2003.

## B. Ballistics

The investigating officer, Dearborn Police Sergeant Karen Wisniewski, testified on behalf of the prosecution.  Sergeant Wisniewski testified that a bullet casing was found under a pillow on the left side of the bed.  There were two holes in the plaster wall, just below the mattress and two spent bullets on the carpeting, directly under the holes.  There was one hole in the sheet and the mattress pad next to one of the strike marks, but no damage to the mattress

2

next to the other.  The appearance of the strike marks, that is, clean margins at the top and more damaged margins at the bottom, indicated that the bullet was traveling downward when it struck the wall.  The marks were consistent with the shots being fired from the center of the bed.

On the right side of the bed, there were holes in the sheet and in the top and the right side of the mattress and a strike mark on the inside of the right rail.  A spent bullet was found at that location, stuck on the bed rail and the sheets.  A second spent bullet was found on the floor, under the front right side of the bed.  These marks were consistent with a weapon being fired from the center of the bed, outward.  Casings are ejected up and out, and usually remain near where the weapon was fired.  Sergeant Wisniewski opined that if a person were shooting from outside the bed, the casings would likely be on the floor.  In this case, there were several casings found on the bed.

There was a hole and powder marks in one of the pillows.  An examiner from the Michigan State Police firearms identification unit testified that the hole and powder marks in the pillow indicated that a gun was fired from close range.  A spent bullet was found inside another pillow.

Sergeant Wisniewski further testified that a hole was found in the center of the mattress, in the middle of a bloodstain, through the sheet and the mattress pad, and a bullet was found loose inside the mattress.  The alignment of the holes was consistent with a weapon being discharged directly downward.  DNA testing revealed that Altoonian's blood matched the blood found in the center of the bed.

Altoonian's 45-millimeter Colt, semi-automatic handgun was found wedged between the bottom bunk bed mattress and the left wall, on top of a cold air return.  The gun case was found at the foot of the bed, on the floor.  A box of ammunition was found under the bed, approximately a foot from the gun case.  All the bullets and spent casings found at the scene were fired by Altoonian's weapon.  There were no fingerprints found on the weapon.

Altoonian's gun uses a cartridge that is loaded with bullets and inserted into the magazine.  As it is a semi-automatic, it ejects cartridges to the right after each shot.  There was no ammunition in Altoonian's gun, but there was a spent casing that failed to eject, jammed in the slide.  A firearms expert testified that if a weapon were fired with a weak or improper grip, there would not be enough pressure exerted on the slide, and the casing will not eject properly, as was seen on Altoonian's gun.

3

There was no gunshot residue found around the wound holes of Altoonian's sweatshirt, but the sweatshirt was not tested for gun residue on the wrist cuffs, where the hands would be. Altoonian was not tested for gun residue because she not initially considered a suspect. Further, the fact that the sweatshirt was bloody could have resulted in a false positive.

The officer in charge of the case concluded from all the evidence that the shooter had to have been in the bed, between the two children.

Former state police trooper David Balash testified for the defense as an expert in the areas of firearm identification, bullet trajectory, crime scene analysis, and blood spatter analysis. Balash believed that if the shooter had been in the bed with the children there would be a concentration of spent casings and gunpowder residue in that area, and there was neither. Balash believed that the position of the casings indicated that the gun was fired from the foot of the bed or from the open right hand side.

Balash believed that there was no hole in the center of the mattress, contrary to the police reports. Instead, he indicated that a bullet had ricocheted off the wall and into the mattress. However, he later conceded that he did not know that spent bullets were found on the floor under each of the wall strike marks. He then agreed that there was a slit in the center of the mattress, but maintained that it was not made by a bullet. He testified that there were no holes in the sheets at the center of the bed, but conceded there were tears at that location that may have been caused by a bullet, including some on the mattress pad.

Balash believed that bullets being fired perpendicular to the wall made the marks on the walls. He later conceded, however, that to hit the wall perpendicularly, the bullet would have had to go through the mattress, but there was no hole in the mattress at that location.

Balash believed that a bullet traveling downward, at a 45-degree angle made the mark on the right side rail. However, he later agreed that, to create the angle he identified on the right side rail, the shooter would have had to shoot through the dust ruffle at the foot of the bed "or you would have to be on the bed."

## C. The Handwritten Notes

After the incident, while Altoonian was still hospitalized, Shelly Taylor went

4

to the Altoonian home to help pack up the boys' belongings. Taylor and Altoonian had an on-and-off intimate relationship for 10 or 12 years, and lived together for three or four years.

In the attic, Taylor found two notes handwritten by Altoonian. Taylor turned the notes over to Don Altoonian, who gave them to the police. The two notes were found together and, therefore, the prosecutor theorized that they were written at about the same time. One of the notes, a multipage list, referred to Altoonian's broken taillight, which Don Altoonian stated had been broken for no more than six or seven months. The other note, a sort of poem, stated:

> If this is the life I was born to lead, why did you allow me to live, let alone breed. Now I am responsible for 2 more lives. You have made me stay no matter what [sic] for me lies.
>
> I no longer have an easy way out, there are too many people depending on me for me to cop out. Why did you not let me die, while I lie in utereto [sic], upside down. When I lay on the table and walk to the light, why did you drag me back to this place? Nothing has changed, yet all is different, all new set of challenges, some quite significant.
>
> I beg of you, my Lady, to take me out of all this heat, to a place that is shady. I only wish to depart this life, and bring with me my children, for that is all the good I've done.

Don Altoonian did not know when this poem was written and noted that Altoonian tended to keep things for a long time.

### D. Altoonian's Depression and Thoughts of Suicide

Dean Erickson, Altoonian's former boyfriend, testified that a year before the killings, Altoonian was depressed and wrote a suicide note, which he found in the garbage. Jerry Dyer, Altoonian's ex-husband, testified that she used to talk about killing herself as an attention ploy and once told him that her life would probably be better without the children. Ronald Stanis, a suitor of Altoonian, testified that, one to three months before the killings, she told him that she was depressed and in financial trouble, and was thinking of killing herself and the children. Taylor confirmed that Stanis relayed this conversation to her. Another former boyfriend, Michael Florn, testified that Altoonian had recently told him that she was a lousy mother, that the children would probably be

better off without her, and that she had considered putting them up for adoption and killing herself.

Altoonian had surgery in November 2001, and had not been able to work since then. Because she could not work, she was not able to pay her bills, including her car payment and car insurance. She was depressed over the surgery and her finances. She was afraid to drive to get food stamps or take the children to preschool because she was afraid her car would be repossessed. She was receiving approximately $575 in monthly Social Security benefits because of her Meniere's disease, but no child support.

Altoonian told her sister, Bonnie Pawlowski, that she was depressed about her surgery and wished she were dead. She also said that her body looked "hideous." According to Pawlowski, Altoonian wished that the doctor had given her more pain medication, so she could take it all at once. Altoonian had attempted to kill herself with a gun in 1994.

Defendant's mother, Joyce Gascoyne, testified that Altoonian had discussed killing herself a couple of times, including in September 2001, and was considering entering a psychiatric program. In October 2001, Altoonian asked her mother for $4,500 for an elective surgery, but Gascoyne refused.

Rachel Redmond testified that she and Altoonian had an on-and-off intimate relationship from 1983 until about 1991, had lived together twice, for several months at a time, but that she had not seen Altoonian in approximately nine years. Redmond introduced Altoonian to Taylor, but Altoonian was "very violent with [Taylor]," so Redmond "wrote her off as a friend."

In 1991, Altoonian took Taylor's father shotgun, locked herself in a room, and said that she was going to kill herself. Taylor broke into the room and Altoonian had the shotgun to her stomach, but the safety was on and they took the gun away. Altoonian threatened to harm herself more than ten times during the time Redmond knew her. She took pills at least twice, cut her wrist once, and threatened to jump into traffic another time.

Taylor confirmed that Altoonian tried to shoot herself with Taylor's father's shotgun. On another occasion, according to Taylor, Altoonian was very upset because she had a fight with a boyfriend and locked herself in a room, fired a gun, and shot a hole in the wall. She also talked about committing suicide at other times.

E. Altoonian's Injuries and Competence

Altoonian was shot in the left upper chest, at approximately the base of the neck, and the bullet exited on the left upper back. Vascular surgeon Dr. Michael Israel testified that when he saw Altoonian, she was unable to speak and was paralyzed on the right side, which indicated that she had a stroke to the left side of the brain. The left carotid artery was almost completely severed, and a clot had formed, preventing the flow of blood to the brain, but if the clot released, she would quickly bleed to death. The carotid artery was repaired, and the flow of blood to the brain was reestablished. Her ability to speak and her motor functions then improved, but only to approximately 50 percent, by the time of discharge. Dr. Israel believed there was evidence of close range firing in the entrance wound by the neck. He believed that Altoonian was injured several hours before she was found, perhaps as long as 24 hours, but was not certain.

When the police interviewed Altoonian in early January 2002, she did not have any problems speaking and asking for an attorney. She told the police that her ex-husband Dyer had shot her and the children. She later changed her mind and told the police that Dyer was not the shooter; rather, a stranger came to the house and shot them.

Pawlowski visited Altoonian at the hospital and asked her if Dyer was responsible and Altoonian became agitated and shook her head affirmatively. She initially told Pawlowski that she did not know who did this, she later blamed Erickson, and then later stated that the father of the children, Jimmy Bunch, paid Dyer to shoot them. Pawlowski also visited Altoonian at the jail, and Altoonian made her open her purse and show that she did not have a tape recorder inside. Altoonian also told her father that maybe Erickson was the shooter.

Taylor testified that, after the shooting, Altoonian had problems speaking and remembering words. She also had difficulty expressing herself. Taylor questioned Altoonian about the shooting and made notes of Altoonian's responses. Taylor eventually turned over her notes to the police.

Altoonian was reluctant to speak about the killings in front of others. She asked Taylor whether she (Altoonian) had killed the children. Altoonian told Taylor that a man had committed the crime with her gun, but did not name anyone and could not describe him. She also told Taylor that she was sorry. Altoonian wanted to know whether her family and the police thought that she

7

did it.  She also complained that everyone cared about the children and no one cared about her.  Altoonian told Taylor that she had "tried," and that she should be dead.

In late January 2002, the trial court ordered a diagnostic evaluation of Altoonian.  After two interviews, the trial court's clinical psychologist opined that, although Altoonian had difficulty expressing herself, she was competent to stand trial.

In October 2002, Altoonian moved for a competency hearing, and Altoonian was referred for a forensic evaluation, including extensive neuropsychiatric tests and interviews.  Forensic psychologist Donna Kelland, Ph.D., concluded that Altoonian suffered from "marked expressive language difficulties and memory problems" and was functioning in the "borderline range of intelligence."  Defendant's expressive language difficulties included not only "impaired fluency but also difficulties in comprehension."  "Memory testing revealed severe verbal learning and memory difficulties characterized by encoding/storage deficits and marked confabulatory tendencies."  Defendant's nonverbal memory and reasoning skills were stronger.  Kelland found no "compelling indication" that defendant's symptoms were feigned or exaggerated.

Psychologist Lois Wightman, Ph.D., also evaluated Altoonian's competence to stand trial and conducted neuropsychological testing.  According to Wightman, Altoonian's intelligence quotient was borderline, that is, below average, whereas at age 15, it was in the superior range.  Altoonian suffered from a type of aphasia, that is, difficulty in choosing the right words to express herself.  Her reports of the shooting were variable and lacking in detail.  She also exhibited memory deficits, difficulty paying attention and recalling information, and a tendency to confabulate.  Wightman explained that "confabulation" sometimes occurs in amnesic disorders and is the filling-in of information, such as giving answers to questions that are not truly recalled due to the memory impairment.  Wightman clarified that confabulation is not a conscious attempt to be deceiving; it is a tendency to fill in information as if it were a memory without recognition that it is not a memory.  According to Wightman, the false memory need not have an outside source, such as a suggestion by someone.  According to Wightman, memory deficits and confabulation are not uncommon in stroke patients.  Wightman opined that Altoonian was incompetent to stand trial.  Wightman stated that although Altoonian "appeared capable of understanding the nature and object of the proceedings against her, she did not appear capable of assisting in her defense

i[n] a rational manner due to her current mental condition." According to Wightman, Altoonian's memory difficulties "would make it difficult for her to follow trial proceedings, evaluate testimony, and provide information relevant to her defense." The trial court found that Altoonian was incompetent to stand trial and committed her to the Center for Forensic Psychiatry for treatment.

In July 2003, the Center's unit coordinator, Sandra Brown-Bingham, recommended that Altoonian be found competent to stand trial. According to Brown-Bingham, Altoonian had completed the recommended courses of treatment in physical medicine, physical therapy, and occupational therapy. She was able to express herself appropriately, although she continued to have "some minor impairment speech delays and word finding." Brown-Bingham believed that Altoonian's "ability to converse with her attorneys is intact" and that Altoonian was "highly motivated to continue with the court process and is prepared to engage in the proceeding to the best of her abilities." Brown-Bingham stated that Altoonian had a good relationship with her attorneys, that she was "able to report a consistent version of what she recalls occurred on the date of the incident," but that she "continues to display amnesia regarding the specific events surrounding the actual crime." Altoonian understood the nature and object of the proceedings against her, "demonstrated the ability to assist rationally in her own defense," and "expressed a willingness to work with her attorney." Following a July 31, 2003 hearing, the trial court found Altoonian competent to stand trial.

Altoonian moved for reconsideration, raising amnesia as a basis for incompetency. The trial court ruled that although amnesia was a factor to be considered in making a determination of competency, the focus was on Altoonian's ability to understand the proceedings against her and assist in her own defense. The trial court was not persuaded that Altoonian was incompetent to stand trial.

Altoonian was convicted in October 2003, and Altoonian moved for a post-trial competency hearing. The trial court was not convinced that Altoonian's memory loss was so severe that she could not assist her attorneys in her defense. Further, the trial court found that the evidence against Altoonian, although circumstantial, was overwhelming, and did not at all support the defense theory that someone else was present in the bedroom and committed the crime. Thus, the trial court denied the motion for a post-trial competency evaluation.

*People v. Altoonian*, No. 267398, 2007 WL 1791706, at *1-6 (Mich. Ct. App. June 21, 2007).

Petitioner's conviction was affirmed. *Id., lv. den.* 480 Mich. 954 (2007).

Petitioner filed a petition for writ of habeas corpus, which was held in abeyance to permit petitioner to return to the state courts to exhaust additional claims.

Petitioner filed a post-conviction motion for relief from judgment, which was denied. *People v. Altoonian,* No. 02-005415-01 (Wayne County Circuit Court, March 2, 2011). The Michigan appellate courts denied petitioner leave to appeal. *People v. Altoonian,* 308816 (Mich.Ct.App. July 30, 2013); *lv. den.* 494 Mich. 882 (2013).

On February 6, 2014, the Court reopened the case to the Court's active docket and permitted petitioner to amend her habeas petition. In her original and amended habeas petitions, petitioner seeks habeas relief on fourteen grounds:

> I. The trial court committed reversible error in refusing to find the Defendant incompetent to stand trial in the face of evidence that Defendant's organic brain injury prevented her from assisting in her defense in a rational manner and by failing to hold an adequate hearing, prior to or after trial, to refute the prior finding of incompetency.
>
> II. The trial court committed reversible error by allowing a police officer to give her opinion on the trajectory of bullets fired during the crime despite the fact that no evidentiary foundation was laid that would permit opinion.
>
> III. The trial court committed reversible error by admitting undated handwritten documents, testimony regarding Defendant's financial condition and crime scene and autopsy photographs over the objection of defense counsel.
>
> IV. There was insufficient evidence with which to convict Defendant of first degree premeditated murder.

10

V. The prosecutor's conduct during the trial was such that the Defendant was denied a fair and impartial trial.

VI. The cumulative effect of the errors committed resulted in a denial of Defendant's due process rights.

VII. Altoonian was denied the effective assistance of appellate counsel by counsel's failure to comply with Michigan Court Rule 7.210(B)(2) by filing a transcript.

VIII. Altoonian was denied her right to effective assistance of appellate counsel by her counsel's conflict of interest in representing her both at trial and on appeal, preventing a claim of ineffective assistance of counsel.

IX. Altoonian was denied due process when the trial court forced her to stand trial while incompetent, denying her a post-conviction hearing on her competence.

X. The prosecutor committed misconduct by referencing Altoonian's failure to testify during closing.  Trial counsel was ineffective for failing to object or request a curative instruction.

XI. The prosecutor committed misconduct in closing by denigrating Altoonian's father to the jury to impugn his testimony and character.  Trial counsel was ineffective for not objecting or requesting a curative instruction.

XII. The prosecutor improperly condemned, criticized, and denigrated Altoonian's inconsistent statements to police when she was medically, mentally, and physically unstable and diagnosed as incompetent.  Trial counsel was ineffective for failing to file motions to quash all of her statements made during her time of incompetence.

XIII. Trial counsel was ineffective for failing to file an insanity defense, failing to obtain a psychiatric evaluation, failure to investigate her treating psychiatrist, and for failing to get those records.  Appellate counsel was ineffective for failing to raise these claims on direct appeal.

XIV. Appellate counsel was ineffective for failing to federalize issues II through VII on direct appeal.

## II.  Standard of Review

11

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas

cases:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim–
>> (1)     resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly established
>> Federal law, as determined by the Supreme Court of the
>> United States; or
>> (2)     resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the
>> evidence presented in the State court proceeding.

 A decision of a state court is "contrary to" clearly established federal law if the

state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law or if the state court decides a case differently than the Supreme Court has

on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06

(2000).  An "unreasonable application" occurs when "a state court decision unreasonably

applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A

federal habeas court may not "issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly." *Id.* at 410-11.  "[A] state court's determination

that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

could disagree' on the correctness of the state court's decision." *Harrington v. Richter*,

12

131 S. Ct. 770, 786 (2011).

### III. Discussion

**A.  Claims # 1 and # 9.  The mental competency claims.**

Petitioner first argues in her first and ninth claims that the trial court erred in finding her competent to stand trial and in refusing to order additional competency evaluations or conduct a new evidentiary hearing on the issue of competency, either before trial or at sentencing.  Petitioner claims that the traumatic brain injury she suffered as a result of the gunshot wound to her head left her with amnesia and aphasia which rendered her incompetent to stand trial.

The Michigan Court of Appeals rejected petitioner's claim:

> Altoonian was initially declared incompetent to stand trial in January 2003, and referred for treatment.  An updated report, dated July 2003, indicated that Altoonian had completed recommended courses of treatment.  She was able to express herself appropriately, understood the nature and object of the proceedings against her, demonstrated the ability to assist rationally in her own defense, and expressed a willingness to work with her attorney.  There is no indication in the available record that Altoonian presented any evidence or witnesses at the July 31, 2003 hearing to counter the prosecutor's showing that she was then competent to stand trial.  Altoonian argued that the brain injury that she suffered during the crime affected her memory and ability to recall the events surrounding the crime.  But a defendant's amnesia concerning the crime is not automatically grounds for a finding of incompetence to stand trial.  Further, where the evidence is overwhelming, such that the defendant's memory of the events would have been of questionable assistance, and the defendant otherwise has the present ability to consult with and assist her attorney, the defendant's amnesia concerning the crime will not be found to result in serious prejudice, and does not render her incompetent to stand trial.  Here, as noted by the trial court at sentencing, the prosecutor's case was very strong, such that Altoonian's memory was of questionable assistance in her defense, and Altoonian had the present ability to consult with and assist her attorney.  Additionally, Altoonian failed to come

13

forward with any new evidence of incompetence at the time of trial or at sentencing. Therefore, we conclude that the trial court did not abuse its discretion in reaffirming its pretrial finding, and in declining to order a post-trial competency hearing.

*Altoonian*, 2007 WL 1791706, at * 7-8 (internal footnotes omitted).

A defendant may not be put to trial unless he or she has a sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and a rational as well as a factual understanding of the proceedings against him. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). A state may presume that a defendant is competent to stand trial and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence. *Id.* at 355.

A habeas petitioner's mental competency claims "can raise issues of both substantive and procedural due process." *Hastings v. Yukins,* 194 F. Supp. 2d 659, 670 (E.D. Mich. 2002). A habeas petitioner may make a procedural competency claim by alleging that the state trial court failed to conduct a competency hearing after the petitioner's mental competency was put in issue. However, to succeed on the procedural claim, a habeas petitioner must establish that the state trial judge ignored facts which raised a "*bona fide* doubt" regarding petitioner's competency to stand trial. *Walker v. Attorney General for the State of Oklahoma*, 167 F. 3d 1339, 1343 (10th Cir. 1999)(internal citations omitted); *Hastings,* 194 F. Supp. 2d at 670. Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinions on competence to stand trial are all relevant in determining whether further inquiry by a trial

14

court on a defendant's mental state is required, but even one of these factors standing alone, may in some circumstances, be sufficient to trigger a further inquiry into a defendant's mental fitness to stand trial. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). However, there are no fixed or immutable signs which invariably indicate the need for a further inquiry to determine the fitness to proceed. *Id.* There must be some manifestation or conduct on a habeas petitioner's part "to trigger a reasonable doubt as to his or her competency." *Hastings v. Yukins,* 194 F. Supp. 2d at 671. A trial court is permitted to rely on its own observations of the defendant's comportment or demeanor to determine whether that defendant is competent to stand trial. *Id.* (*citing to Bryson v. Ward*, 187 F. 3d 1193, 1201 (10th Cir. 1999)).

A full competency hearing is necessary only when a court has a reason to doubt a defendant's competency to stand trial. *Godinez v. Moran*, 509 U.S. 389, 401, n. 13 (1993). "The due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is substantial evidence of a defendant's incompetency." *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012). The question for a reviewing court is "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Mackey v. Dutton*, 217 F.3d 399, 413-14 (6th Cir. 2000)(quoting *Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir. 1983)(additional quotation omitted).

"A state-court determination of competence is a factual finding, to which

15

deference must be paid." *Franklin,* 695 F. 3d at 447 (citing *Thompson v. Keohane*, 516 U.S. 99, 108–11 (1995)).  Regardless of whether a federal habeas court would reach a different conclusion regarding a habeas petitioner's competence to stand trial were it reviewing the case *de novo*, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary, and this deference must be paid even to state-court factual findings made on appeal. *Id.*

In the present case, although there were earlier reports suggesting that petitioner was mentally incompetent, the Forensic Center's unit coordinator, Sandra Brown-Bingham, issued a report in July of 2003 which recommended that petitioner be found competent to stand trial.  According to this report, petitioner completed treatment in physical medicine, physical therapy, and occupational therapy.  The report indicated that petitioner was able to communicate appropriately, even though she continued to have "some minor impairment speech delays and word finding."  Brown-Bingham believed that petitioner's "ability to converse with her attorneys is intact" and that petitioner was "highly motivated to continue with the court process and is prepared to engage in the proceeding to the best of her abilities."  Brown-Bingham stated that petitioner had a good relationship with her attorneys, that she was "able to report a consistent version of what she recalls occurred on the date of the incident," but that she "continues to display amnesia regarding the specific events surrounding the actual crime." Petitioner understood the nature and object of the proceedings against her, "demonstrated the ability to assist rationally in her own defense," and "expressed a

16

willingness to work with her attorney." The judge chose to find petitioner competent based on this report.

Although petitioner points to earlier reports from Dr. Donna Kelland and Dr. Wightman from the end of 2002, in which they believed that petitioner was not competent to stand trial, Brown-Bigham opined after observing petitioner at the Forensic Center that she was competent to stand trial. The judge chose to believe Brown-Bigham's report. Petitioner is not entitled to relief because she failed to show that the judge was "clearly wrong" in believing Brown-Bigham or that the judge's decision that petitioner was competent to stand trial was an unreasonable determination of the facts. *See Franklin v. Bradshaw*, 695 F.3d at 449.

Petitioner's procedural competency claim fails because there is no evidence in the record which should have raised a *bona fide* doubt with the trial court as to petitioner's competency to stand trial.

Petitioner's basis for her mental incompetency is primarily her claim that she has no memory of the crime because the gunshot wound caused her to have amnesia.

Amnesia about a crime "does not render a defendant per se incompetent to stand trial." *United States v. Andrews*, 469 F. 3d 1113, 1119 (7th Cir. 2006)(collecting cases). In order to determine whether a defendant's amnesia renders him or her incompetent to stand trial, courts should consider such factors as:

    (1) Whether the defendant has any ability to participate in his defense;
    (2) Whether the amnesia is temporary or permanent;
    (3) Whether the crime and the defendant's whereabouts at the time of the crime

17

can be reconstructed without the defendant's testimony;
(4) Whether access to government files would aid in preparing the defense;
(5) The strength of the government's case against the defendant.

*Id.* at 1119.

In the present case, the evidence of petitioner's guilt as the shooter was overwhelming, and petitioner failed to identify any "reasonable defenses" she was precluded from raising due to her claimed amnesia. *Andrews*, 469 F.3d at 1121. The judge thus did not abuse his discretion in finding petitioner competent to stand trial.

Petitioner further claims that she was incompetent to stand trial because she suffered from aphasia as a result of the gunshot wound, which made it difficult to communicate with her attorneys.

Petitioner has failed to offer any evidence that she was unable to speak with her attorneys as a result of her injury. Petitioner was able to speak with the police on the night of the shooting at the hospital and several family and friends who spoke with petitioner after the murders claimed they had no difficulty speaking with her. Petitioner was able to give different accounts of the shooting to several different people and even expressed concern about these conversations being recorded. Petitioner had the ability in May and July of 2002 to write letters to the judge in which she sought a discovery order and complained about her court appointed counsel. Finally, Brown-Bingham indicated in her report that petitioner was able to speak with her attorneys. Petitioner has presented no evidence from her trial to rebut these findings.

A habeas petitioner can also raise a substantive competency claim by alleging that

18

he was tried and convicted while mentally incompetent.  However, a habeas petitioner

raising a substantive claim of incompetency is not entitled to a presumption of

incompetency and must demonstrate his or her incompetency by a preponderance of the

evidence. *Walker*, 167 F. 3d at 1344; *Hastings v. Yukins,* 194 F. Supp. 2d at 671.  To

obtain habeas relief on a substantive incompetence claim, a habeas petitioner must

present evidence which is sufficient "to positively, unequivocally, and clearly generate a

real, substantial and legitimate doubt as to his mental capacity" to stand trial. *Thirkield v.

Pitcher,* 199 F. Supp. 2d 637, 653 (E.D. Mich. 2002)(internal quotations omitted).  A

habeas petitioner is entitled to an evidentiary hearing on the issue of his competency to

stand trial "if he presents sufficient facts to create a real and substantial doubt as to his

competency, even if those facts were not presented to the trial court." *Id.*  However,

"[A]lthough retrospective determinations of competency are not prohibited, they are

disfavored, and the Court will give considerable weight to the lack of contemporaneous

evidence of petitioner's incompetence." *Thirkield,* 199 F. Supp. 2d at 653.

Petitioner has failed to present evidence which clearly and unequivocally raises a

substantial and legitimate doubt as to her mental capacity to stand trial.  Petitioner has

offered no evidence which shows that she was mentally incompetent during the trial or

was unable to understand the proceedings or assist her attorneys with her defense.

Because petitioner has presented no conclusive evidence that she was not in possession

of his mental facilities at the time of trial, her "after- the-fact" incompetency claim is

without merit. *Hastings v. Yukins,* 194 F. Supp. 2d at 672.  Petitioner is not entitled to

19

relief on her first claim.

**B.  Claims # 2 and # 3.  The evidentiary law claims.**

The Court consolidates petitioner's second and third claims for judicial clarity because they involve state evidentiary law issues.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to deciding whether a state court conviction violates the Constitution, laws, or treaties of the United States. *Id.*  Thus, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not questioned by a federal habeas court. *Seymour v. Walker,* 224 F. 3d 542, 552 (6th Cir. 2000); *See also Bridinger v. Berghuis,* 429 F. Supp. 2d 903, 908-09 (E.D. Mich. 2006).

In her second claim, petitiooner contends that the state court erred in allowing Sergeant Wisniewski to give her opinion regarding the trajectory of the bullets fired during the shooting even though there was no evidentiary foundation that would permit this evidence.

The Michigan Court of Appeals rejected petitioner's claim, finding that Sergeant Wisniewski's opinion was permissible under M.R.E. 701, because it was based on her own observations and perceptions, and not scientific, technical, or other specialized knowledge, as required for the admission of expert testimony under M.R.E. 702. *Altoonian*, No. 2007 WL 1791706, at * 9.

20

Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005)(*quoting Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). The Michigan Court of Appeals concluded that Sergeant Wisniewski's testimony was permissible lay opinion under state evidentiary law. This Court sitting on federal habeas review may not conclude otherwise, thus, petitioner is not entitled to habeas relief on her claim that the officer's testimony was impermissible lay opinion testimony. *See Charles v. Thaler*, 629 F. 3d 494, 500 (5th Cir. 2011).

In her third claim, petitioner contends that the trial court erred in admitting evidence or her undated handwritten notes, testimony concerning her financial condition, and crime scene and autopsy photographs. Petitioner contends that this evidence was irrelevant and more prejudicial than probative.

Petitioner's claim that she was denied a fair trial by the admission of irrelevant and highly prejudicial evidence cannot form the basis for habeas relief, because it involves a state law evidentiary issue. *See Hall v. Vasbinder*, 551 F. Supp. 2d 652, 676 (E.D. Mich. 2008); *rev'd on other grds* 563 F.3d 222 (6th Cir. 2009); *See also Oliphant v. Koehler*, 451 F. Supp. 1305, 1308 (W.D. Mich. 1978).

Petitioner's related claim that the trial court admitted photographs of the murder victims fails to state a claim upon which habeas relief can be granted. *See e.g. Franklin v. Bradshaw,* 695 F. 3d 439, 456-57 (6th Cir. 2012); *Cooey v. Coyle,* 289 F. 3d 882, 893-94 (6th Cir. 2002).

21

**C. Claim # 4. The sufficiency of evidence claim.**

Petitioner next argues that there was insufficient evidence to convict her of the two first-degree murder counts.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19(internal citation and footnote omitted)(emphasis in the original). Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence at trial to exclude every reasonable hypothesis except that of guilt. *Johnson v. Coyle,* 200 F. 3d 987, 992 (6th Cir. 2000)(internal quotations omitted).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas

22

relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. See *Cavazos v. Smith,* 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* For a federal habeas court reviewing the sufficiency of evidence for a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S.Ct. 2060, 2065 (2012).

Petitioner contends that there was insufficient evidence of premeditation to establish the elements of first-degree murder and that there was no evidence to establish her identity as the shooter. The Michigan Court of Appeals rejected petitioner's claim:

> Here, the evidence showed that Altoonian told several people that she was depressed about her financial condition and was contemplating suicide. She told people that she was considering killing herself and her children. She wrote a note expressing the idea of killing herself and the children. Altoonian's gun was identified as the weapon used to shoot the children. Each child was shot at least twice and there was evidence that the shots were fired from close range.
>
> Viewed in a light most favorable to the prosecution, the evidence was sufficient to show premeditation and deliberation. Altoonian's identity as the perpetrator was further shown by the lack of any evidence suggesting that someone else was present inside the house when the crime was committed, and the presence of evidence indicating that the shots originated from the center of the bed, where her blood was found. Thus, we conclude that the evidence was sufficient to support Altoonian's convictions.

*Altoonian*, No. 2007 WL 1791706, at *11.

To constitute first-degree murder in Michigan, the state must establish that a

defendant's intentional killing of another was deliberated and premeditated. *See Scott v. Elo*, 302 F. 3d 598, 602 (6th Cir. 2002)(*citing People v. Schollaert*, 194 Mich. App. 158; 486 N.W.2d 312, 318 (1992)).  The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. *See Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001)(*citing People v. Anderson*, 209 Mich. App. 527, 537; 531 N. W. 2d 780 (1995)).  Premeditation may be established through evidence of the following factors:

> 1. the prior relationship of the parties;
> 2. the defendant's actions before the killing;
> 3. the circumstances of the killing itself;
> 4. the defendant's conduct after the homicide.

*Cyars v. Hofbauer,* 383 F. 3d 485, 491 (6th Cir. 2004); *Anderson*, 209 Mich. App. at 527.

Although the minimum time required under Michigan law to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *See Williams v. Jones,* 231 F. Supp. 2d 586, 594-95 (E.D. Mich. 2002)((*quoting People v. Vail,* 393 Mich. 460, 469; 227 N.W. 2d 535 (1975)).  "A few seconds between the antagonistic action between the defendant and the victim and the defendant's decision to murder the victim may be sufficient to create a jury question on the issue of premeditation." *Alder v. Burt,* 240 F. Supp. 2d 651, 663 (E.D. Mich. 2003).  "[A]n opportunity for a 'second look' may occur in a matter of seconds, minutes, or hours, depending upon the totality of the circumstances surrounding the killing."

24

*Johnson,* 159 F. Supp. 2d at 596(*quoting People v. Berthiaume*, 59 Mich. App. 451, 456 (1975)).  Premeditation and deliberation may be inferred from the type of weapon used and the location of the wounds inflicted. *See People v. Berry*, 198 Mich. App. 123, 128; 497 N. W. 2d 202 (1993).  Use of a lethal weapon will support an inference of an intent to kill. *Johnson,* 159 F. Supp. 2d at 596 (citing *People v. Turner*, 62 Mich. App. 467, 470; 233 N.W. 2d 617 (1975)).  Finally, premeditation and intent to kill may be inferred from circumstantial evidence. *See DeLisle v. Rivers,* 161 F. 3d 370, 389 (6th Cir. 1998).

There was sufficient evidence of premeditation and deliberation to support petitioner's convictions for first-degree murder.  Petitioner told people that she was considering killing herself and her two children.  Evidence that petitioner had contemplated murdering the victims and committing suicide supports a finding of premeditation and deliberation. *See United States v. Sutton,* 426 F.2d 1202, 1210-13 (D.C. Cir. 1969).  Evidence that the victims were shot at close range supports a finding of premeditation and deliberation. *See Crenshaw v. Renico,* 261 F. Supp. 2d 826, 833 (E.D. Mich. 2003).  Finally, the firing of multiple gunshots at the victim was sufficient to establish premeditation and deliberation. *See Crawley v. Curtis*, 151 F. Supp. 2d 878, 888-89 (E.D. Mich. 2001).

There was also sufficient circumstantial evidence to establish petitioner's identity as the perpetrator.  Identity of a defendant can be inferred through circumstantial evidence. *See Dell v. Straub,* 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002).  The evidence

25

established that petitioner told several people that she wanted to kill herself and her

children and wrote a note to that effect.  Petitioner's gun was used to murder the victims

and shoot petitioner.  There was no evidence of forced entry into the house or any

evidence to suggest another shooter.  There was also evidence that the shots originated

from the center of the bed, where petitioner's blood was found.

Because there were multiple pieces of evidence to establish the petitioner's

identity as the perpetrator of the murders, the Michigan Court of Appeals did not

unreasonably apply *Jackson v. Virginia* in rejecting petitioner's sufficiency of evidence

claim. *See Moreland v. Bradshaw,* 699 F. 3d 908, 919-21 (6th Cir. 2012).

### D.  Claim # 5.  The prosecutorial misconduct claims.

Petitioner next claims that she was deprived of a fair trial because of prosecutorial

misconduct.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas

review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)(citing *Bowling v. Parker*,

344 F.3d 487, 512 (6th Cir. 2003)).  A prosecutor's improper comments will be held to

violate a criminal defendant's constitutional rights only if they "'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'" *Darden v.

Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S.

637, 643 (1974)).  Prosecutorial misconduct will thus form the basis for habeas relief

only if the conduct was so egregious as to render the entire trial fundamentally unfair

26

based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at

643-45.  In order to obtain habeas relief on a prosecutorial misconduct claim, a habeas

petitioner must show that the state court's rejection of his or her prosecutorial

misconduct claim "was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement."

*Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012)(quoting *Harrington*, 131 S. Ct., at

786–87).

Petitioner first contends that the prosecutor improperly commented on her failure

to testify.

In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court held that neither

the trial court nor the prosecutor may invite the jury to infer guilt from the defendant's

decision not to testify.  They may not "solemnize [ ] the silence of the accused into

evidence against him," 380 U.S. at 614, or "suggest[ ] to the jury that it may treat the

defendant's silence as substantive evidence of guilt." *Baxter v. Palmigiano*, 425 U.S.

308, 319 (1976) (emphasis added).

The Michigan Court of Appeals, in rejecting petitioner's claim, concluded that the

prosecutor did not comment on petitioner's failure to testify.  To the contrary, the

prosecutor advised the jury that petitioner had a right right not to testify and that she had

no burden of proof, and specifically asked the jurors not to consider the fact that she did

not testify.  The trial court later instructed the jury that petitioner had no duty to testify

27

and the jurors could not use that silence against her. *Altoonian*, No. 2007 WL 1791706, at *12.

The prosecutor did not improperly comment on petitioner's right to testify, thus, petitioner failed to show prosecutorial misconduct. To the extent that the prosecutor's comments could even be viewed as an indirect comment on petitioner's failure to testify, petitioner would not be entitled to habeas relief because the comment was isolated and the trial court instructed the jury about petitioner's right not to testify. *See Joseph v. Coyle,* 469 F. 3d 441, 474 (6th Cir. 2006).

Petitioner next claims that the prosecutor improperly stressed petitioner's poor financial condition as evidence of her motive for the murders, improperly commented on petitioner's surgery in order to reveal petitioner's occupation as a topless dancer, and improperly injected petitioner's prior lesbian relationships in order to prejudice the jurors.

The Michigan Court of Appeals ruled that petitioner's financial problems were relevant to establish her motive for the murders. The Michigan Court of Appeals further ruled that the prosecutor did not bring up that petitioner was a topless dancer, but only brought up that petitioner was depressed from the breast implant removal surgery also to establish motive. The Michigan Court of Appeals finally concluded that petitioner's romantic relationships with Taylor and Redmond "was disclosed in a casual, nonsensationalistic manner, to lend credibility to the witnesses' testimony that they knew

her well, had known her for a very long time, and knew that she had attempted to kill herself in the past." Altoonian, No. 2007 WL 1791706, at *12.

Although petitioner has framed this portion of her claim as a prosecutorial-misconduct challenge, "it amounts in the end to a challenge to the trial court's decision to allow the introduction of this evidence." *Webb v. Mitchell*, 586 F. 3d 383, 397 (6th Cir. 2009). "A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008). The Michigan Court of Appeals concluded that this evidence was relevant and admissible and that the prosecutor acted in good faith in admitting this evidence. This Court cannot second guess that determination.

Petitioner lastly contends that the prosecutor committed misconduct by referring to petitioner's expert witness, David Balash, as "a bit of a hired gun" and as "Super Dave."

Another judge in this district has rejected a similar claim involving similar questions and comments. See *Fuller v. Lafler,* 826 F. Supp. 2d 1040, 1059 (E.D. Mich. 2011)(prosecutor's characterization of expert medical witness who was called by defendant in child sexual abuse case as "hired gun" was not so inflammatory that it affected fairness of trial so as to rise to level of a due process violation).

Petitioner is not entitled to habeas relief on her fifth claim.

**E. Claim # 6.  The cumulative errors claim.**

29

Petitioner next contends that she is entitled to habeas relief because of the cumulative effect of the errors in his case.

The cumulative weight of alleged constitutional trial errors in a state prosecution does not warrant federal habeas relief, because there is no clearly established federal law permitting or requiring the cumulation of distinct constitutional claims to grant habeas relief. *Moore v. Parker,* 425 F. 3d 250, 256 (6th Cir. 2005).  Therefore, petitioner is therefore not entitled to habeas relief on the grounds of cumulative error. *Id.*

**F.  Petitioner's remaining claims are procedurally defaulted or meritless.**

Respondent contends that petitioner's remaining claims are procedurally defaulted because petitioner raised these claims for the first time in her post-conviction motion, and failed to show cause and prejudice for failing to raise these claims in his appeal of right, as required by M.C.R. 6.508(D)(3).

When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991).  If petitioner fails to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533 (1986).  However, in an extraordinary case, where a constitutional error has probably resulted in the conviction of

30

one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986).  However, to be credible, such a claim of innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998).

Michigan Court Rule 6.508(D)(3) provides that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom.

The Supreme Court has noted that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989).  If the last state court judgment contains no reasoning, but simply affirms the conviction in a standard order, the federal habeas court must look to the last reasoned state court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

31

The Michigan Court of Appeals and the Michigan Supreme Court rejected
petitioner's post-conviction appeal on the ground that "the defendant has failed to meet
the burden of establishing entitlement to relief under MCR 6.508(D)."  These orders,
however, did not refer to subsection (D)(3) nor did they mention petitioner's failure to
raise these claims on his direct appeal as their rationale for rejecting her post-conviction
claims.  Because the form orders in this case citing Rule 6.508(D) are ambiguous as to
whether they refer to procedural default or a denial of post-conviction relief on the
merits, the orders are unexplained. *See Guilmette v. Howes*, 624 F. 3d 286, 291 (6th Cir.
2010).  This Court must "therefore look to the last reasoned state court opinion to
determine the basis for the state court's rejection" of petitioner's claims. *Id.*

The Wayne County Circuit Court judge, in rejecting petitioner's post-conviction
claims, several times indicated that petitioner failed to satisfy the "good cause" and
"actual prejudice "requirement under M.C.R. 6.508(D)(3) for failing to raise her claims
on her appeal of right. *People v. Altoonian,* No. 02-005415-01-FC, Slip. Op. at * 2, 3, 7.
The trial judge clearly and repeatedly invoked M.C.R. 6.508(D)(3)(b) in denying
petitioner's post-conviction claims.  Because the trial court judge denied petitioner post-
conviction relief based on the procedural grounds stated in M.C.R. 6.508(D)(3),
petitioner's post-conviction claims are clearly procedurally defaulted pursuant to M.C.R.
6.508(D)(3). *See Ivory v. Jackson,* 509 F. 3d 284, 292-93 (6th Cir. 2007). [1]  The fact that

---

[1] Of course, to the extent that some of petitioner's post-conviction claims were a reiteration of the claims
that she had already raised on her direct appeal, these claims were not procedurally defaulted and were addressed on

32

the trial judge also discussed the merits of petitioner's claims in addition to invoking the provisions of M.C.R. 6.508(D)(3) to reject petitioner's claims does not alter this analysis. *See Alvarez v. Straub,* 64 F. Supp. 2d 686, 695 (E.D. Mich. 1999). A federal court need not reach the merits of a habeas petition where the last state court opinion clearly and expressly rested upon procedural default as an alternative ground, even though it also expressed views on the merits. *McBee v. Abramajtys*, 929 F. 2d 264, 267 (6th Cir. 1991). Petitioner's remaining claims that she raised for the first time on post-conviction review are procedurally defaulted. [2]

Petitioner alleges ineffective assistance of appellate counsel as cause to excuse her procedural default and as an independent claim. Petitioner in her eighth claim also alleges that her appellate counsel was ineffective because he was laboring under a conflict of interest in that he was also her trial counsel. Petitioner contends that because of this conflict, prejudice should be presumed and she is thus automatically entitled to a new trial or at least a new appeal.

The Sixth Circuit has held that a court should not use the presumed prejudice standard set forth in *Cuyler v. Sullivan,* 446 U.S. 335 (1980) in evaluating a claim of an alleged conflict of interest arising from a counsel's successive representation of a defendant at trial and on his or her direct appeal. *See Whiting v. Burt,* 395 F. 3d at 602,

---

the merits by this Court, *supra*.

[2] Petitioner could not have procedurally defaulted her ineffective assistance of appellate counsel claim, because state post-conviction review was the first opportunity that he had to raise this claim. *See Guilmette*, 624 F. 3d at 291. However, for the reasons stated below, petitioner is not entitled to habeas relief on this claim.

619 (6th Cir. 2005).  Instead, a court must apply the *Strickland* standard to determine

whether a defendant was actually prejudiced by appellate counsel's ineffectiveness, even

where that appellate counsel was also the defendant's trial counsel. *Id.*  The fact that

petitioner was represented on appeal by the attorney who represented her at trial would

not automatically entitle her to relief.

The Sixth Amendment guarantees a defendant the right to the effective assistance

of counsel on the first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985).

However, it is well-established that a criminal defendant does not have a constitutional

right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v.*

*Barnes*, 463 U.S. 745, 751 (1983).  The United States Supreme Court has explained:

> "For judges to second-guess reasonable professional judgments and impose
> on appointed counsel a duty to raise every 'colorable' claim suggested by a
> client would disserve the ... goal of vigorous and effective advocacy....
> Nothing in the Constitution or our interpretation of that document requires
> such a standard."
> *Id.* at 463 U.S. at 754.

Moreover, "[A] brief that raises every colorable issue runs the risk of burying

good arguments-those that, in the words of the great advocate John W. Davis, 'go for the

jugular,'-in a verbal mound made up of strong and weak contentions." *Id.* at 463 U.S. at

753 (citations omitted).

Strategic and tactical choices regarding which issues to pursue on appeal are

"properly left to the sound professional judgment of counsel." *United States v. Perry*,

34

908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. at 536 (*quoting Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards,* 281 F. 3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a reversal on appeal. *See Meade v. Lavigne,* 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner failed to show that appellate counsel's performance fell outside the wide range of professionally competent assistance by omitting the claims that she raised in her post-conviction motion. Appellate counsel filed a thirty five page brief on appeal which raised the first six claims raised by petitioner in her habeas application. [3] Petitioner has not shown that appellate counsel's strategy in presenting such claims and not raising other claims was deficient or unreasonable. Moreover, for the reasons stated by the Wayne County Circuit Court in denying post-conviction relief, *Altoonian,* No. 02-005415-01-FC, Slip. Op. at * 2-7, none of the claims raised by petitioner in her post-conviction motion were "dead bang winners." Because the defaulted claims are not "dead bang winners," petitioner failed to establish cause for her procedural default of

---

[3] *See* Appellant's Brief on Appeal. [Part of this Court's Dkt. # 6-5].

35

failing to raise these claims on direct review. *See McMeans v. Brigano,* 228 F. 3d 674, 682-83 (6th Cir. 2000).

Moreover, because these post-conviction claims lack merit, this Court rejects any independent ineffective assistance of appellate counsel claim raised by petitioner. "[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F. 3d 448, 452 (6th Cir. 2010)(quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).  To the extent that petitioner claims that appellate counsel was ineffective for failing to file on appeal the transcript from the July 31, 2003 hearing in which the trial judge ruled that petitioner was competent to stand trial, petitioner failed to establish that this transcript would have revealed any reversible error, thus, petitioner is unable to establish that she was prejudiced by appellate counsel's failure to obtain and submit this transcript. *See e.g. Bransford v. Brown,* 806 F.2d 83, 87 (6th Cir. 1986).  Finally, petitioner has failed to show that appellate counsel's alleged failure to "federalize" her second, third, fifth or sixth claims was ineffective because regardless of whether the claims were presented as a federal claim to the state courts, the claims are without merit. *See Burger v. Prelesnik,* 826 F. Supp. 2d 997, 1012 (E.D. Mich. 2011).

Petitioner has not demonstrated any cause for the procedural default of the claims that she raised for the first time in her motion for relief from judgment, thus, it is unnecessary to reach the prejudice issue. *Smith*, 477 U.S. at 533; *Payne v. Smith,* 207 F.

Supp. 2d 627, 638-39 (E.D. Mich. 2002).

Additionally, petitioner has not presented any new reliable evidence to support any assertion of innocence which would allow this Court to consider the procedurally defaulted claims as grounds for a writ of habeas corpus in spite of the procedural default. Petitioner's sufficiency of evidence claim (Claim # 4, *supra*) is insufficient to invoke the actual innocence doctrine to the procedural default rule. *See Malcum v. Burt,* 276 F. Supp. 2d 664, 677 (E.D. Mich. 2003).  Because petitioner has not presented any new reliable evidence that she is innocent of these crimes, a miscarriage of justice will not occur if the Court declined to review petitioner's defaulted claims on the merits. *See Payne,* 207 F. Supp. 2d at 639.

Finally, assuming that petitioner had established cause for her default, she would be unable to satisfy the prejudice prong of the exception to the procedural default rule, because her claims are meritless.  The cause and prejudice exception is conjunctive, requiring proof of both cause and prejudice. *See Matthews v. Ishee,* 486 F. 3d 883, 891 (6th Cir. 2007).  For the reasons stated by the Wayne County Circuit Court in rejecting petitioner's post-conviction claims on post-conviction review, as well as for the reasons stated by the respondent in their answer to the petition, petitioner failed to show that her claims have any merit.  Petitioner's remaining claims are barred by procedural default.

## IV.  Conclusion

The Court will deny the petition for writ of habeas corpus.  The Court will also

deny a certificate of appealability to petitioner.  In order to obtain a certificate of

appealability, a prisoner must make a substantial showing of the denial of a

constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the applicant is

required to show that reasonable jurists could debate whether, or agree that, the petition

should have been resolved in a different manner, or that the issues presented were

adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473,

483-84 (2000).  When a district court rejects a habeas petitioner's constitutional claims

on the merits, the petitioner must demonstrate that reasonable jurists would find the

district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at

484.  Likewise, when a district court denies a habeas petition on procedural grounds

without reaching the prisoner's underlying constitutional claims, a certificate of

appealability should issue, and an appeal of the district court's order may be taken, if the

petitioner shows that jurists of reason would find it debatable whether the petitioner

states a valid claim of the denial of a constitutional right, and that jurists of reason would

find it debatable whether the district court was correct in its procedural ruling. *Id.* at

484.[4]

For the reasons stated in this opinion, the Court will deny petitioner a certificate

of appealability because she has failed to make a substantial showing of the denial of a

---

[4]  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

federal constitutional right with respect to any of the claims.  The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *See Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

## V. <u>ORDER</u>

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED that a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*

Date: March 25, 2015                         <u>s/John Corbett O'Meara</u>
                                             United States District Judge


I hereby certify that a copy of this opinion and order was served upon the parties of record on this date, March 25, 2015, using the court's ECF system and/or by first-class U.S. mail.


                                             <u>s/William Barkholz</u>
                                             Case Manager

39